[No. 3499.  Decided August 6, 1900.]

Annie L. Sharp, *Respondent,* v. Roger S. Greene and W. S. Harrington, *Executors, et al., Appellants.*

22  677
e39  269

NEW TRIAL—GRANT OF—WHEN ABUSE OF DISCRETION.

Where fraud is charged in the sale of property by the executors of an estate, and inadequacy of consideration is relied upon to raise the presumption of fraud, and the only substantial conflict in the evidence is expert testimony as to the value of the property, and the court has no doubt as to the evidence and the correctness of its decision thereon, and, in granting a new trial, assigns no legal ground therefor, but declares that, if called upon to again render judgment on the same evidence, it would render the same judgment, its action constitutes an abuse of discretion.

SALE OF LAND BY EXECUTOR—ACTION TO SET ASIDE—INADEQUACY OF PRICE—SUFFICIENCY OF EVIDENCE.

In an action by a residuary legatee to set aside a conveyance made by executors on the ground of great and manifest inadequacy of price, from which fraud or lack of judgment and discretion on the part of the executors should be presumed, the evidence warrants a judgment for defendants, when there is no proof of fraud on their part, and it appears that they listed the property with two different real estate agents before selling it for $1,800, which was the highest figure they were able to obtain from such agents; and that the expert testimony of the plaintiffs put a valuation on the property of from $1,800 to $2,500, while that of defendants fixed the valuation at sums ranging from $1,500 to $1,800.

Appeal from Superior Court, King County. — Hon. JAMES A. WILLIAMSON, Judge. Reversed.

*Austin E. Griffiths* and *Frank P. Lewis,* for appellants.

*William H. Brinker* and *R. S. Jones,* for respondent:

This property was a trust in the hands of trustees with power to sell. *McBurney v. Carson,* 99 U. S. 567 (25 L. ed. 378). In this case the trustees were bound to exercise "the highest degree of care which prudent men use in their own affairs." *Hutchinson v. Lord,* 60 Am. Dec. 381; *Litchfield v. White,* 57 Am. Dec. 534; *Bogart v. Van Velsor,* 4 Edw. Ch. 718; *Johnston v. Eason,* 3 Ired. Eq. 330; *Denny v. Palmer,* 5 Ired. Law, 610, cited in note to 24 Am. Dec. 274. A failure to exercise such care constitutes a cause for which equity will set aside a sale, and will also render the executors liable in damages. 2 Woerner, Law of Administration, p. 1062; *Patterson v. Smelting Works,* 56 Pac. 410; *James v. Cowing,* 17 Hun, 267; *Duffy v. Duncan,* 32 Barb. 587.

Stirrat & Goetz, being purchasers with knowledge that they were dealing with a trust, are bound to show that their purchase was for full value, when the sale is attacked by the *cestui que trust. Wilkinson v. Bauerle,* 7 Atl. 514.

In such case the purchaser from a trustee, with notice of the trust, stands in the same relation to the property as one trustee purchasing from another trustee. *Kirsch v. Tozier,* 42 Am. St. Rep. 729; *Cassell v. Ross,* 85 Am. Dec. 270; *Heth v. Richmond, etc., R. R. Co.,* 50 Am. Dec. 88; *Kinloch v. I'On,* 26 Am. Dec. 196; *Union Pacific Railway v. McAlpine,* 129 U. S. 305 (32 L. ed. 673). The trustee should so act as to render the sale most beneficial to those interested. *Tatum v. Holliday,* 59 Mo. 422; *Chesley v. Chesley,* 49 Mo. 540; *Hunt v. Bass,* 2 Dev. Eq. 292 (24 Am. Dec. 274); note to 19 Am. St. Rep. 284.

The opinion of the court was delivered by

WHITE, J.—On November 22, 1898, at Seattle, one Lucy Wilcox, then a resident of that city, died, seized in fee simple of lot 8 in block 52 of A. A. Denny's Extension to Terry's Addition to the city of Seattle, known as "704 Spring Street," leaving a last will, under which appellants, Greene and Harrington, were made executors without bonds. On December 15, 1898, her will was duly probated in the superior court at Seattle, and the appellants Greene and Harrington qualified as executors and thereafter acted as such. The will conferred full and complete authority and power upon the executors to bargain, sell, and convey said real estate, and to manage and settle the estate without direction or supervision of the probate or any court. On December 24, 1898, said court made an order declaring the estate to be solvent. The respondent is a residuary legatee, but not of kin to the testatrix. On the 11th day of March, 1899, the appellants Stirrat and Goetz, for the sum of $1,800, purchased, and received a deed of said lot from said executors. The appellants Stirrat and Goetz recorded the deed and entered into possession of the lot. The respondent brought this action in equity to set aside the sale and deed to Stirrat and Goetz,

or for damages against the executors, alleging in substance in the complaint that the property in controversy was at the time of the sale to Stirrat and Goetz well worth the sum of $3,000; that about the 9th of March, 1899, when she learned of the proposed sale to Stirrat and Goetz, she protested to the executors against said sale, and notified them that she was ready and willing to take care of, pay off, and provide for all the debts of the testatrix and all legacies and expenses of administration; that, notwithstanding, the executors on the 11th of March, 1899, sold said property to Stirrat and Goetz for $1,800; that Stirrat and Goetz knew at the time they purchased that the real value of the property was $3,000, and that the sum of $1,800 was grossly inadequate as a consideration for the purchase; that the executors willfully and fraudulently, and with the full intent and purpose to wrong and defraud the respondent of her rights under the will of the testatrix, and for the purpose of exhausting the entire estate of the testatrix in the payment of the debts of the estate and legacies prior to the residuary legacy and bequest to the plaintiff, sold the property to Stirrat and Goetz for the sum of $1,800 and executed and delivered to Stirrat and Goetz the deed therefor; that such transfer and sale was fraudulent and void and damaged the rights of the respondent. The respondent also alleges in her complaint that the debts of the testatrix were not more than $1,300, and that there were bequests amounting to $450. The personal estate of the testatrix was bequeathed to Mrs. Vrooman. The debts and specific legacies were to be paid, and the rest and residue of the estate was bequeathed to the respondent. The respondent further alleged that at all times she had been and was ready and willing to pay the debts and legacies and costs of administration. The prayer for relief was that the deed to Stirrat and Goetz be set aside, or, if that could not be done, for a money compen-

sation by way of damages from the executors to reimburse
the estate for the fraud, wrong, and damages to said estate
by reason of the facts set forth. There is no allegation
in the complaint that the executors knew that the property
was worth $3,000, or any particular sum. Appellants
Stirrat and Goetz denied all the allegations of the com-
plaint, except the death of the testatrix; that at the time
of her death she was the owner of the property in contro-
versy, and that she made and executed the will alleged,
and the probate of the same, etc., and that Greene and
Harrington, as executors of the estate of the testatrix, sold
and conveyed the said property to them. They affirma-
tively pleaded that they purchased the same in good faith
for a good and sufficient consideration, to-wit, $1,800, and
paid the said sum to the executors, and that they pur-
chased the same in the usual course of business at its fair
and reasonable market value, to-wit, $1,800, from the
executors, who had the right and authority to sell and con-
vey. The appellants, Greene and Harrington, denied the
fraud alleged in the complaint. They affirmatively alleged
that the reasonable value and worth of said property was
the sum of $1,800, and no more. They denied that re-
spondent had made arrangements to pay the debts, lega-
cies, and expenses of administration, so as to retain said
property, and denied that respondent so notified them.
They also denied that respondent notified them, when she
learned of the proposed sale, that she was ready and will-
ing to take care of, pay off, and provide for said debts,
legacies, etc. They admit that she protested against the
sale, but allege that such protest was after the sale had
been made and part of the purchase money had been paid
to them. Respondent replied to the answer of appellants
Stirrat and Goetz, denying the matter pleaded affirma-
tively. On May 10, 1899, this action was tried on the
merits, and, argument by counsel being waived, the court

at once, after stating the reasons for the decision, dismissed said action with costs. On May 12, 1899, respondent moved for a new trial, and obtained an order to show cause, upon which the motion was brought on for argument. On August 23d the court, by order, granted a new trial of this action, and made and filed a written opinion, in which the trial judge assigned the reasons therefor.

Four grounds were assigned in the motion for a new trial: (1) That the evidence was and is insufficient to justify the decision, and that the decision herein is and was against law and equity; (2) errors in law and equity occurring at the trial, and excepted to at the time by the plaintiff; (3) that the facts found and recited by the trial court in its verbal decision are contrary to the evidence and contrary to fact; (4) that the law as stated and decided by the trial court in its decision is not and was not the law of this case, and is and was contrary to law and equity. This motion is not in the statutory language, but amounts to an assignment of two legal causes for vacating the decision, corresponding to subdivisions 7 and 8, § 5071, Bal. Code:

" 7. Insufficiency of the evidence to justify the verdict or other decision, or that it is against law. 8. Error in law occurring at the trial and excepted to at the time by the party making the application."

Before passing on the ruling of the court in granting a new trial, it will be necessary to examine the evidence touching the allegations of the complaint; that the respondent duly notified the executors of her intention and arrangements to pay off the debts, legacies, etc., and to retain the property, and that she protested against the sale, and was ready to pay the debts, legacies, etc.; that said executors willfully and fraudulently, and with intent and purpose to wrong and defraud respondent, and for the purpose of exhausting the entire estate, made such sale.

These allegations are for the purpose of showing that the executors acted fraudulently. The respondent's evidence to sustain these allegations amounts to this: Corwin Shank, an attorney, was employed by the husband of the respondent, acting as her agent, to look after her interest. He was to see what the will definitely was, and when he was employed the husband stated that when the will was probated, and he got around to it, he would furnish the money to take the property. Pursuant to that employment, Mr. Shank called on the executor Greene, who explained the situation, and went over the entire estate, told the prospective claims that would be filed against the estate, and explained the condition of the title to the property in controversy; that when he (Shank) was first employed nothing was said to him about this property, but that the talk was relative to the advisability of putting in a claim against the estate; that subsequently Mr. Sharp did mention this property, and after he was advised as to the status of his wife's rights in the matter he (Sharp) stated to Shank "that, if the claims were not too large, he didn't know but what he would be willing to take up the claims and take the property." Shank further says that he thinks that in his talk with Judge Greene that fact was mentioned, but there was no particular point made of it. Mr. Sharp testifies that after he heard the property was to be sold he called up the executor Harrington over the telephone, and said to him that he had heard that the place was being offered for $1,800, and Harrington replied that he did not know that the place was offered for that; that he told Harrington that it was a shame to sacrifice the property for that price and to stop the sale and not let it go through; that he would give $2,500 himself for the property. Harrington replied that the judge (Greene) had the matter in hand. Mr. Sharp was asked if he had made any arrangements to purchase the property, and he

stated that he had; that he went to one Horton, a money
lender, and took him out to look over the property, and
that Horton said he would loan him $1,500 on the prop-
erty; that he next learned that the property was sold the
first of the next week after he talked with Harrington
over the telephone.   Tuesday was the day of the week he
talked with Harrington.   In his talk to Harrington over
the telephone, nothing whatever was said about taking care
of the debts.   Mr. Horton testifies that just before the
holidays Mr. Sharp took him out to look at the property
in regard to getting a loan; that Sharp said about $1,000
would clear it up; that the property was willed to his
(Sharp's) wife; that Sharp asked if it would not be a
good idea to improve it by building on it; that he (Hor-
ton) told him it would; that Sharp asked if he (Horton)
could loan the $1,000.   Horton said he could have the
$1,000 at any time on the lot.   It will be noted that this
conversation with Horton was before the holidays—Christ-
mas, 1898, January 1, 1899.   The evidence fails to show
that after Sharp's talk with Harrington over the telephone
he took any steps to make good his offer.   The property
was sold by the executors on the 9th day of March, 1899.
We have cited all the evidence offered by respondent to
sustain her allegations as to notification to executors of
her intention and arrangements to pay off debts, legacies,
and expenses of administration, and of her readiness to
pay the debts, legacies, expenses of administration, etc.,
and that the executors made the sale for the purpose of
exhausting the entire estate to wrong and defraud the
plaintiff.   We have no hesitation in saying that on these
points there is an entire failure of evidence, either to show
fraud on the part of the executors, or the truthfulness of
these allegations in any respect.   As to the offer of $2,500
which Sharp says he made to Harrington, there is no show-

ing that he had the ability to make good the offer, and he took no steps to inform Judge Greene, the other executor, of the offer. The testimony of W. S. Harrington, one of the executors, testifying for the appellants, is to the effect that the conversation over the telephone with Sharp was after the property had been sold; for he says that in that conversation Sharp told him the lot had been sold for $1,800, and expressed his displeasure at the sale for that price. From the time the will was probated, in December, 1898, until the sale of the property, March 9, 1899, there is no evidence whatever showing that the respondent, or any one for her, made any effort to advance sufficient, or any, funds to pay off debts, legacies, etc., or that the executors had any good reason to believe that she would do so. It was the duty of the executors to sell the property and discharge the indebtedness against the estate, and if they exercised care and prudence in the discharge of that duty, to the same extent that a man of ordinary care, skill, and prudence would use in his own transactions with his own property under like circumstances, no one can be heard to complain. There is but one other question affecting the good faith of the transaction. Was the consideration paid for the lot so grossly inadequate as to raise the presumption of fraud, or to show a plain want of judgment and discretion on the part of the executors? Before considering this, however, we will dispose of the question raised by the respondent: Did the trial judge abuse his discretion in granting a new trial? Under numerous decisions of this court, it has been held that unless there was an abuse of this discretion the appellate court would not interfere with the order granting a new trial. In *Rotting v. Cleman,* 12 Wash. 615 (41 Pac. 907), it is said:

"A motion for a new trial is addressed to the sound discretion of the court and will not be interfered with on

appeal unless it is manifest that the discretion vested in the court was grossly abused."

This is stating the rule more strongly than the weight of authority perhaps justifies. In *Holgate v. Parker,* 18 Wash. 206 (51 Pac. 368), a more recent decision, the court says:

" As has been often said by this court, motion for a new trial is addressed to the sound discretion of the court, who is acquainted with all the circumstances surrounding the case, and unless it is manifest that the discretion vested in the court is abused this court will not disturb its judgment."

In the case at bar the trial judge made and filed a written opinion in which he assigned his reasons for granting a new trial, and this opinion is made a part of the record. In that the court says:

" If this motion involved a reversal of the opinion, or, in other words, if I were called upon to either sustain or reverse the case, I should not hesitate to decline to reverse the judgment; to be more specific, if I were now called upon to render a judgment in the case, and the question was whether I should render it upon the testimony as adduced before me for plaintiff, or for the defendants, I should, as I stated in my opinion [referring to the opinion given when he ordered a dismissal of the action] render judgment for the defendants."

Again he says:

" It has been insisted that this is peculiarly a case which should have been heard by the resident judge, who, by reason of his residence, would have been familiar with values, and more especially with the standing of the parties and witnesses. It has been urged that possibly the high character of the defendants, well known to me, with no knowledge of or familiarity with the other parties or witnesses, may have imperceptibly unduly influenced my mind. Possibly such is the case. And at all events a

new trial can do no injury to any one and might insure a more substantial justice."

Again he says:

"In lately considering this question, I am constrained to say that I may have attached too much force to the idea that a higher character of evidence is necessary to sustain this class of cases than, in law, I should have done."

These are the only reasons assigned for granting the new trial. The judge who tried the case was from Tacoma and held the court at the request of the superior judge of King county. No objection before or during the trial was made as to the trial of the case by this judge, and such objection is not made in the motion for a new trial. We are not aware of any rule of law that disqualifies a judge from properly weighing the testimony of a witness because of the high character of the witness, or because the judge is personally acquainted with him, or that requires the judge to be acquainted with all the witnesses, in order that he may intelligently pass upon their testimony. A judge decides the facts in a case like this from the evidence produced on the trial, and not from a general knowledge of the personal character of witnesses testifying in the case, or the local situation and surroundings of the matter in controversy. A new trial for reasons not authorized by law is an injury and loss to the party who has prevailed in the first trial; also, the public good requires that there be an end to litigation. It is a maxim of the law that a man shall not be twice vexed for one and the same cause. The court says, in granting the motion, if he was called upon to again render judgment in the case upon the same testimony, that he should render it for the defendants. If the facts justified such a judgment, it is immaterial whether the reasons given for arriving at that conclusion

in the first instance were sound or not. The court assigned no legal cause for granting the motion for a new trial, and an examination of the record fails to show any such cause. The court granted the new trial because, in his own language, "at all events, a new trial can do no injury to any one, and might insure a more substantial justice."

"Discretion," says Lord Mansfield, "when applied to a court of justice, means sound discretion, *guided by law.* It must be governed by rule; . . . it must not be arbitrary, vague, and fanciful, but legal and regular." *Rex v. Wilkes,* 4 Burr. 2539.

In *Clifford v. Denver, S. P. & P. R. Co.,* 12 Colo. 128 (20 Pac. 335), where it was urged that the presumption was always in favor of the action of the court when it granted a new trial, because the court was vested with discretionary power and it was never interfered with except in a clear case of abuse, the court said:

"Trial courts may certainly exercise a reasonable discretion in granting new trials, when discretionary grounds exist and are relied on by the applicants. It seems to us, however, that, if the rule of practice concerning judicial discretion be as broad as contended for by appellee's counsel, a statute authorizing an appeal from such an order is of little practical effect, for the exercise of judicial discretion would render it a dead letter. In order to give it reasonable effect, trial courts must be required to make correct rulings on legal propositions. Where the ground of the application is insufficiency of the evidence to support the verdict; that the verdict is against the weight of the evidence; that it is unjust and inequitable, and the like,— a reasonable degree of discretion exists to allow or deny a new trial; and, when the questions involved in the application are close, the ruling of the court should not be interfered with. On the other hand, if the ground of the motion relied on does not in fact exist, or does not constitute a legal ground for a new trial, or the necessity for the application is the result of the applicant's negligence, the

motion should be denied or the ruling held to be erroneous.

"The discretion vested in the trial court to grant or refuse a new trial is neither an arbitrary nor a general discretion. It is based on the theory that the judge who tries a case, having the parties, their witnesses and counsel before him, with opportunity to observe their demeanor and conduct during the trial, and to note all incidents occurring during its progress likely to affect the result thereof, is better qualified to judge whether a fair trial has been had, and substantial justice done, than the appellate tribunal. But the fact that the legislative assembly passed a law giving the right of appeal from such orders indicates a purpose to restrict the rulings upon the subject to the application of legal principles."

In the case like the one at bar, where fraud is charged in the sale of property, and inadequacy of the consideration is relied upon to raise the presumption of fraud, and the only substantial conflict in the evidence is expert testimony as to the value of the property, and the court has no doubt as to the evidence and the correctness of its decision thereon, and in granting the new trial declares that, if it was called upon to again render judgment on the same evidence, it would render the same judgment rendered in the first instance, and the law justifies the judgment, and the trial has been fairly and impartially conducted, it is an abuse of discretion to grant such motion.

"The general rule, then, both at law and in equity, is to refuse a second trial where the propriety of the verdict in the former is not impeached as against law or evidence, though there be material evidence for the party against whom the verdict has passed which was not adduced, unless it be shown to have been discovered after the trial, or unless the verdict has been obtained by fraud or surprise. If a mistake in practice or inadvertence furnished reasons for a new trial, it would encourage litigation and reward ignorance and carelessness at the expense of the

other party; and, therefore, our law in such cases wisely acts. upon the maxim, *Interest reipublicae ut sit finis litium,*—it is for the public good that there be end to litigation.". Broom's Legal Maxims (8th ed.), p. 330.

All the evidence given in the court below is before us in this record. The case is fully argued upon its merits in the briefs of the appellants and respondent, and we now pass to a consideration of the remaining question: Can it be presumed from the price received for the land that the executors lacked judgment and discretion, or acted fraudulently in making such sale? Sales will be set aside in equity where there has been fraud, or for great and manifest inadequacy of price, from which fraud or lack of judgment and discretion may be presumed.

Lucy Wilcox conferred by her will on the appellants Greene and Harrington, as her executors, power as follows:

"I also give to my said executors power as such to sell and convey in their discretion any or all the property, real or personal, belonging to my said estate, either for cash or on credit, or partly cash and partly credit, or in any way of barter or exchange for other property, without the authorization or approval of any court, and without liability of any purchaser or other party to any such transaction to look to or be responsible for the application of any purchase money or other consideration; and I give to them full power to make, execute and deliver all lawful deeds or other instruments to carry out or evidence such transaction, without the authorization, approval or confirmation of any court. . . . My said executors or executor shall within one year from the date of the first publication of such notice, or reasonable time afterwards, pay or otherwise satisfy all lawful claims of whatever nature against my estate. . . . And when they or he shall have thus settled my estate they or he shall file in the office of the clerk of the court in which this will shall have been probated, a memorandum in writing signed

by them or him, entitled in the matter of my estate, declaring the estate to have been settled, and thereupon their or his executorship shall be deemed ended."

This is a power to sell expressed in general terms, and the mode of conducting it is within the discretion of the trustees, and any method of sale not out of the usual order of business will be sustained in equity.  2 Beach, Trusts and Trustees, § 479.  The amount of care and diligence required in making such sales by trustees is stated in 2 Pomeroy, Equity Jurisprudence, § 1070, as follows:

" The principle is well settled that trustees are bound to exercise care and prudence in the execution of their trust, in the same degree that men of common prudence ordinarily exercise in their own affairs.  A trustee, in other words, must use the same care, skill, diligence, and prudence in his management of the trust and his dealings with the trust property, which a man of ordinary care, skill, and prudence would use in his own transactions and with his own property under like circumstances; and the trustee is answerable for all losses, deficiencies, and injuries which are occasioned by his affirmative or negative violation of this obligation.  The law does not cast upon the trustee an extraordinary duty, nor demand an extraordinary care, nor hold him liable for mere error of judgment, much less does it make him an insurer of the property.  If he has exercised the care and judgment of ordinary prudent men in their own affairs, he will not be chargeable for his mere errors of judgment, nor for accidental injuries and losses.  This rule concerning the extent and limits of the trustee's duty to use care, diligence, and prudence applies to all his transactions in connection with the trust, and all his dealings with the trust property, by which the interests of the beneficiary can be affected."

The testimony in this case shows that the executors listed this property with Mr. Virtue, a real estate agent in Seattle, for sale, about a fortnight before it was sold. This agent brought an offer of $1,500 for the property

and it was refused.    He had prospective buyers looking at it.    Judge Greene and Mr. Harrington were of the opinion that $1,500 was too low.    They then listed the property with Mr. West, a well known real estate man in Seattle.    West made two offers for the property, one of $1,700 cash, less commission, one of $1,750 cash and time, less commission, both of which were declined.    He then undertook to find a purchaser, and Stirrat and Goetz bought, through him as agent, for $1,800.    The property was sold at a price which was, in the opinion of the executors, its fair market price, and they state that they acted in good faith in making the sale.    There certainly is no evidence showing that they profited personally by the transaction.    The following is a summary of the respondent's testimony as to the value of the property:    Mr. Sharp, the respondent's husband, by occupation a carpenter and builder, and a creditor of the estate, somewhat acquainted with values, considered it cheap at $2,800.    J. D. Smith, a photographer, told Sharp, after the property was sold, but before he knew it was sold, that he would have given $2,400 or $2,500 for it.    It appears that this witness had talked to Sharp about the property before the sale. Neither Sharp nor the witness had ever notified the executors of the desire of this witness to purchase, and when they made the sale they knew nothing about his willingness to give $2,400 or $2,500 for the property.    F. W. West, a real estate agent, stated that he endeavored to get the best price he could for the property, and that he sold it for $1,800, netting the estate, after deducting his commission, $1,710, and that $1,800 was the fair market price for the property.    Jacob Miller, a real estate agent, says he negotiated a sale of it on the 10th of March to Clericus for $2,000, and that it was worth from $2,000 to $2,500. W. Parry Smith, a real estate agent, places its value at

$2,500 on the 11th of March, 1899, and its value in December, 1898, at $2,300.

The following is a summary of the appellants' evidence as to value: C. B. Livermore, real estate agent, says the fair market value on the 9th and 11th of March, 1899, was from $1,500 to $1,800. George Dorfel, real estate agent, says the fair market value on the 9th and 11th of March, 1899, was from $1,600 to $1,700. G. A. Virtue, real estate agent, says the fair market value on the 9th and 11th of March, 1899, was $1,800. J. C. Compton, real estate agent, says the fair market value on the 9th and 11th of March, 1899, was from $1,600 to $1,700. F. W. West, real estate agent, called by both respondent and appellants, and who the respondent admits is an expert, testified that at the time of the sale the fair market value was $1,800. Herman Goetz, one of the appellants, who had bought and sold, and was acquainted with values, places the fair market value at the time of the sale at $1,800. Judge Greene, one of the executors, acquainted with values, places the value at the time of the sale at $1,800.

We cannot say from the evidence in this case that there was an inadequacy of consideration, and we have already seen that there was no fraud in any other respect. The law is well established that, in the absence of fraud, mere inadequacy of consideration is no ground for setting aside a sale, unless the consideration be so grossly inadequate as to indicate fraud, or a plain want of judgment and discretion on the part of the trustee. *Clark v. Trust Co.,* 100 U. S. 149; *Hubbard v. Jarrell,* 23 Md. 66; *Booker v. Anderson,* 35 Ill. 66; 27 Am. & Eng. Enc. Law, p. 233.

For the reasons given, we think the order of the court below in granting a new trial should be reversed and set aside, and it is so ordered. The court below is further

directed to dismiss this action, with costs in favor of the defendants. It is further ordered that the appellants recover their costs in this court.

DUNBAR, C. J., and REAVIS, ANDERS and FULLERTON, JJ., concur.